UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


BARRY W. GILMER                                              PLAINTIFF


VS.                              CIVIL ACTION NO. 3:08cv136TSL-JCS


TOBY TROWBRIDGE, JR., INDIVIDUALLY,
AND IN HIS OFFICIAL CAPACITY AS
SHERIFF OF MADISON COUNTY, MISSISSIPPI;
SCOTT GRAVES, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS DEPUTY SHERIFF OF
MADISON COUNTY, MISSISSIPPI; MADISON
COUNTY, MISSISSIPPI; WESTERN SURETY
COMPANY; AND JOHN DOES 1 THROUGH 10                         DEFENDANTS


<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court for consideration of three
motions: (1) plaintiff Barry Gilmer's motion to dismiss defendant
Western Surety Company; (2) defendant Scott Graves' motion for
summary judgment on immunity grounds as to plaintiff's individual
capacity claims against him; and (3) defendant Toby Trowbridge's
motion to dismiss or, in the alternative, for summary judgment in
his individual capacity.  These motions have been fully briefed,
and the court, having considered the memoranda of authorities,
together with attachments, submitted by the parties, concludes
that plaintiff's motion to dismiss should be denied, Graves'
motion for summary judgment should be granted in part and denied
in part, and Trowbridge's motion for summary judgment should be
granted.

Plaintiff Barry Gilmer filed this action in December 2007 in
the Circuit Court of Madison County, Mississippi against Toby

Trowbridge, Jr., individually and in his official capacity as Sheriff of Madison County, Scott Graves, individually and in his official capacity as a Madison County deputy sheriff, Madison County, Mississippi, and Western Surety Company, as the surety on Sheriff Trowbridge's official bond. Plaintiff asserts claims against defendants for alleged trespass and unlawful search, civil conspiracy, false arrest, false imprisonment, intentional infliction of emotional distress, assault and battery, abuse of process, malicious prosecution, and excessive force, all stemming from incidents occurring on April 14 and 15, 2006 at Gilmer's property in Madison County, which culminated in Gilmer's being twice arrested by Deputy Graves on charges of disorderly conduct, disobeying orders of a law enforcement officer, resisting arrest and contributing to the delinquency of a minor. The case was removed to this court on the basis that certain of plaintiff's claims arose under federal law, 42 U.S.C. § 1983, and specifically out of alleged violations of the Fourth and Fourteenth Amendments to the United States Constitution.

## Gilmer's Motion to Dismiss Western Surety Company

Mississippi Code Annotated § 19-25-5 requires a sheriff to "give bond, with sufficient surety, to be payable, conditioned and approved as provided by law and in the same manner as other county officials, in a penalty equal to One Hundred Thousand Dollars ($100,000.00), the premium for which shall be paid by the county." Plaintiff maintains that for the period commencing January 1, 2000

and continuing through January 1, 2008, Toby Trowbridge never executed and filed a proper "Official Bond and Oath." More specifically, he contends that the bond, issued by Western Surety, for Trowbridge's first term in office, covering the period January 2000 to January 2004, was improper and ineffective since it was in the amount of $50,000 rather than the $100,000 required by the statute. Further, he contends, Trowbridge failed altogether to execute the "Official Bond and Oath" issued by Western Surety Company for the 2004-2008 term. Plaintiff contends that in light of these facts, the Western Surety bond is a nullity and unenforceable, which he submits means that Western Surety Company is improperly named as a defendant in this suit; that all of Trowbridge's actions as Sheriff of Madison County are void or voidable; and that consequently, Deputy Graves did not have "legal authority to effect the arrest and detention of Barry W. Gilmer on April 14 and April 15, 2006." As such, plaintiff claims that Western Surety should be dismissed and the court should rule as a matter of law that Sheriff Trowbridge and Deputy Graves acted solely in their individual capacities *as private citizens* on all relevant occasions.

In their responses to plaintiff's motion, defendants have offered, *inter alia*, the affidavit of Madison County Chancery Clerk Arthur Johnston, in which he explains that when it came to his attention in January 2004 that the bond for the sheriff's 2004-2008 term of office, then recorded in the official bond book

maintained by the Office of the Chancery Clerk, did not include Sheriff Trowbridge's signature, he so informed Sheriff Trowbridge, who then executed the bond, which was then recorded in the official bond book.[1] Mr. Johnston states that notwithstanding that the former Chancery Clerk erroneously recorded the bond before it was executed by Sheriff Trowbridge, Sheriff Trowbridge did, in fact, give the bond required of him under Miss. Code Ann. § 19-25-15 (1972), as amended, for his 2004-2008 term of office, and for his 2008-2012 term of office.[2]

Defendants have also offered the affidavit of Leann Niebuhr, the claims consultant for Western Surety Company who is responsible for the enforceability of the official bond issued to Madison County, in which she states that Western Surety considers the official bond it sold to Madison County, Mississippi, in the sum of $100,000 for and on behalf of Sheriff Trowbridge, enforceable and binding on Western Surety Company as required

---

[1]   Mr. Johnson's affidavit does not address the bond covering Trowbridge's 2000-2004 term of office.  However, that bond is irrelevant to these proceedings, which involve occurrences during Trowbridge's 2004-2008 term of office.  However, as defendants have contended, even if the 2000-2004 bond were somehow applicable, under Mississippi Code Annotated § 25-1-15(3), considered _infra_, the fact that the official bond does not state the "proper penalty" does not render it ineffective.


[2]   Plaintiff has moved to strike Johnston's affidavit "as lacking personal knowledge and predicated upon false, fabricated assertions of fact."  Plaintiff's motion to strike is patently without merit and is denied.

under Mississippi law, regardless of whether Sheriff Trowbridge executed that bond.

Defendants further point out that under Mississippi law, the fact that a required bond is not in the proper form does not affect its enforceability. In this regard, Mississippi Code Annotated § 25-1-15(3) states as follows:

> A failure to observe the form herein prescribed shall not vitiate any official bond; and all official bonds shall be valid and binding in whatever form they may be taken, except so far as they may be conditioned for the performance of acts in violation of the laws or policy of the state. Whether in the proper penalty or without any penalty, whether correct or incorrect in its recitals as to the term of office or otherwise, whether properly payable, whether approved by the proper officer or not approved by any, or if irregular in any other respect, such bond, if delivered as the official bond of the officer or employee and serving as such, shall be obligatory on everyone who subscribed it for the purpose of making the official bond of such officer or employee to the full penalty or, if it has no penalty, to the full penalty of the bond which might have been required.

See also Town of Gloster v. Harrell, 77 Miss. 793, 23 So. 520 (Miss. 1898) (holding that where surety executes bond and delivers it as a public official's "official bond," the surety is bound by the bond regardless of whether or not the public official signs it).

Inasmuch as plaintiff's motion to dismiss Western Surety is premised on his incorrect assertion that the bond is void, the motion to dismiss will be denied (and this is notwithstanding that defendants advise that they have no objection to the dismissal of the surety). Moreover, plaintiff's related argument that defendants acted as private citizens and hence are not entitled to

5

qualified immunity or immunity under the Mississippi Tort Claims
Act due to Sheriff Trowbridge's alleged failure to sign the
appropriate bond is without merit.

### Section 1983: Qualified Immunity

Both Sheriff Trowbridge and Deputy Sheriff Graves have moved
for summary judgment as to plaintiff's § 1983 claims on the
grounds of qualified immunity.  Qualified immunity is provided to
government officials while exercising their discretionary
authority so long as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known.  Evett v. DETNTFF, 330 F.3d
681, 687 (5th Cir. 2003).  Qualified immunity "protects all public
officers from individual liability except those 'who are plainly
incompetent or who knowingly violate the law.'"  Dean v. Thomas,
933 F. Supp. 600, 607 (S.D. Miss. 1996) (quoting Malley v. Briggs,
475 U.S. 335, 340, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271
(1986)).  Courts conduct a bifurcated analysis to determine
whether a government official is entitled to qualified immunity,
as follows:

> First, the plaintiff must allege the violation of a clearly
> established constitutional right. . . . Second, the actions
> of the officer must be objectively reasonable under the
> circumstances, such that a reasonably competent officer would
> not have known his actions violated then-existing clearly
> established law.

Evett, 330 F.3d at 687 (citing Mangieri v. Clifton, 29 F.3d 1012,
1016 (5th Cir. 1994).  If an official's conduct was objectively
reasonable, it does not matter if that official's conduct violated

a constitutional right; he is still entitled to qualified immunity.  <u>Nerren v. Livingston Police Dept.</u>, 86 F.3d 469, 473 (5th Cir. 1996) (citations omitted).  Whether an officer's actions were objectively reasonable is a question of law for a court to decide.  <u>Evett</u>, 330 F.3d at 687.  The critical issue for the court is "whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." <u>Goodson v. Corpus Christi</u>, 202 F.3d 730, 736 (5th Cir. 2000).

According to the complaint in this cause, plaintiff Barry Gilmer lives in Madison County, Mississippi, at 300 Catlett Road. Pam and Tommy Miller also live in Madison County, on property adjacent to Gilmer's property.  On April 14, 2006, Gilmer's twenty-year-old son, Matthew Gilmer, and a number of his friends, were shooting skeet on the Gilmer property, near the fence line between the Gilmer and Miller properties.  Pam Miller called 911 to complain.  Mrs. Miller told the dispatcher, "I've been having a problem for quite a while with my neighbor, but his son, they're over at my fence line, they're fighting, they're shooting firearms, and I'm a little nervous when somebody shoots my house." When the dispatcher explained to Mrs. Miller that shooting firearms in the county is not illegal, Mrs. Miller responded that her neighbor was Barry Gilmer, that she and her husband had been in litigation with Gilmer, and that Gilmer and his son had been harassing her and her family at night.  She complained, "They play

loud music, they fire firearms.  You know, I think they're

dangerous, but I'd like someone to come see what I see every day."

Deputy Scott Graves was dispatched to the Millers' home to

investigate.

While en route to the scene, Deputy Graves spoke with Sheriff

Toby Trowbridge by radio:

> Trowbridge:  It will be the very last house on the right
> on Kehle Road there.  I think Barry Gilmer is giving her
> fits.  We've [Pam Miller and I] discussed it before.
> Like I say, it's the last house on the right.  It runs
> into his property there in the field that goes back way
> to his house there.
>
> Graves: 10-4.
>
> Trowbridge:  See what you can do to help her there.  You
> know, I don't know what he's doing over there, but even
> if it takes going over there and talking to him or
> whatever.
>
> Graves: 10-4.

Upon arriving at the Millers' residence to investigate Mrs.

Miller's complaint, Deputy Graves initially spoke with Tommy

Miller, who stated that Matthew Gilmer and his friends had "been

shooting guns and playing loud and obscene music all afternoon and

were right at the property line."  The parties' versions of events

diverge significantly at this point.

According to Graves' version, after initially speaking with

the Millers, he tried to talk to Matthew Gilmer to get information

from him so that he could make out a report on Mrs. Miller's

complaint for disturbing the peace, but Matthew was uncooperative

and refused to provide any information.  Then, when Matthew called

8

his father to the scene, Graves drove his patrol car to the Gilmer property to speak with plaintiff. Prior to plaintiff's arrival, Graves spoke via radio to Sheriff Trowbridge, and explained what was happening. The record reflects the following conversation between these defendants:

> Trowbridge: Well, if he [Matthew Gilmer] doesn't want to give you information, do something with him.
>
> Graves: 10-4. Got his daddy en route now. What do you want me to do with him?
>
> Trowbridge: I'm sure he's [Barry W. Gilmer] going to have an attitude with you so watch him.
>
> Graves: Sounds like disturbing the peace, I mean disorderly conduct.
>
> Trowbridge: Better get somebody else over there with you.

Graves contends that after he drove onto the Gilmer property, plaintiff approached his patrol car and struck the window of the vehicle. According to Graves, at that point, he got out of the car and told Gilmer not to beat on the window. He claims that plaintiff was obviously intoxicated, and that the elder Gilmer was

> very rude and told me to get out of my car and talk with him. I told Gilmer I would speak with him in just a minute and Gilmer began to curse and become disorderly. I told Gilmer to calm down and he refused to calm down. . . . I began to place Gilmer into custody and while trying to place him in restraints Gilmer pulled his hand away from me.

Deputy Graves arrested plaintiff for disorderly conduct, for disobeying the orders of a law enforcement officer, and for resisting arrest. He transported plaintiff to the Madison County Detention Center, where plaintiff posted bond and was released.

Then, in the early morning hours of April 15, 2006, shortly after plaintiff had returned home after posting bond, Graves, along with three other deputies, responded to another complaint of disturbing the peace at the Gilmer property. Upon arriving at the property, Graves found and arrested a minor who was consuming alcohol on the property. In the meantime, the officers had determined that there was an outstanding warrant for Matthew Gilmer from the Oxford Police Department on a failure to appear charge. Plaintiff came out of his house to see what was going on, and according to Graves, as he was speaking with plaintiff about the underage drinking occurring on the property, the elder Gilmer became disorderly, using loud, boisterous and profane language. Graves thus arrested him for disturbing the peace and contributing to the delinquency of a minor. This is the version of facts on which Graves has based his summary judgment motion.

Deputy Graves

In his motion for summary judgment, Graves argues that based on the facts set forth supra, the court must conclude as a matter of law that he acted in an objectively reasonable manner in entering onto plaintiff's property in the first place to investigate the Millers' complaint; his decision thereafter to arrest plaintiff for disorderly conduct was objectively reasonable, given that plaintiff was intoxicated, loud and belligerent, and his actions were threatening a breach of the peace, particularly given the presence of a group of intoxicated

young adults with guns; and the decision to charge plaintiff with resisting arrest was also manifestly reasonable, given that plaintiff jerked or moved his hand away when Graves attempted to apply handcuffs.  Likewise, Graves argues that, as a matter of law, his entering onto plaintiff's property the second time to investigate a disturbing the peace complaint was objectively reasonable; his decision to arrest plaintiff for disturbing the peace was also objectively reasonable, given plaintiff's intoxicated state and his use of loud, boisterous and profane language; and the charge of contributing to the delinquency of a minor was supported by probable cause, given that a minor was discovered consuming alcohol on the premises.

Under Graves' version of the facts, his actions in arresting plaintiff may have been objectively reasonable, and he may have been entitled to qualified immunity.  Plaintiff's version of the facts, however, is far different from that offered by Deputy Graves; and under plaintiff's version, which is the version this court must credit when considering the motion for summary judgment, Deputy Graves' arrests of plaintiff were not objectively reasonable.

Plaintiff claims that prior to Deputy Graves' entering onto the Gilmer property, the officer had already determined that Matthew Gilmer and his friends had done nothing illegal; they were not firing guns toward the Miller home, as Mrs. Miller had claimed; they were not fighting, as Mrs. Miller had claimed; and

while they may have been playing loud music, that was not against the law and in any event, Matthew had already turned down the volume of the music. Plaintiff claims, moreover, that Matthew was responsive and polite to the deputy. Thus, plaintiff asserts that even though there was nothing left for Graves to investigate, Graves nevertheless entered onto plaintiff's property for no other purpose than to harass plaintiff, and with the intent to arrest plaintiff on contrived charges. Citing Graves' conversation with Sheriff Trowbridge in which Trowbridge had commented that plaintiff would probably have an "attitude" and Graves would need to "watch him," and Graves' response that it "sounds like disorderly conduct," plaintiff posits that Graves had already decided to charge plaintiff with disorderly conduct before plaintiff even arrived on the scene. Consistent with this theory, plaintiff maintains that when he merely calmly inquired as to the reason for Graves' presence, Graves screamed at him and refused to respond. And, when he calmly told Graves to either make an arrest, provide a lawful reason for being on plaintiff's property, or get off plaintiff's property, Graves, without cause or provocation, grabbed plaintiff by the shoulder, spun him around, ordered him to put his hands behind his back, and roughly handcuffed him, telling plaintiff he was under arrest. Graves refused to tell plaintiff what he was being charged with, and he refused plaintiff's request to get his wallet from his car so he would be able to post bond. Graves put him in the patrol car, and

transported him to the Madison County Detention Center for booking on a charge of disorderly conduct and disobeying the order of a law enforcement officer.  Plaintiff was released after a member of his law firm arrived and posted bail for him.

Plaintiff states that when he arrived back home around midnight, he told Matthew to ask his friends to leave; but as he was preparing for bed, he saw sheriff's deputies blocking the driveway so that no one could leave.  He also noticed that deputies with flashlights were searching his property, including a camper trailer and mobile home on the property.  When he yelled at the deputies that they could not search unless they had a search warrant, one of the deputies told him to come out of the house.  When he got outside, he found Deputy Graves putting handcuffs on Matthew, because, according to Graves, "Oxford want[ed] him."  Yet when plaintiff tried to explain to Graves that there was no legitimate reason to arrest Matthew and offered to get documents from his car to show Graves that the Oxford matter had been resolved, Graves, without provocation or cause, grabbed plaintiff's left arm and began handcuffing him.  Plaintiff claims that when he protested that Graves was making a mistake and that plaintiff would bond out of jail, Graves responded, "I cost you $1,000 before and I will cost you another $1,000 now."

Plaintiff was again transported to the Madison County Detention Center, where he was booked on charges of disorderly conduct, disobeying the orders of a law enforcement officer and

contributing to the delinquency of a minor.  As in the case of his
first arrest, plaintiff maintains that he did not use any profane
language or direct any abusive language to Deputy Graves or any
other deputy, and that he made no gesture or any other erratic
movement toward the deputy which could reasonably have provoked
any response from him, and that he did not disobey any lawful
order of Deputy Graves.  He further maintains that he did not
furnish any beer or alcohol to any minor, or to anyone else, on
April 14 or April 15, 2006, and that he had never even been in the
presence of the minor who was arrested on his property for
underage drinking.

On this summary judgment record, the material facts as to the
circumstances preceding plaintiff's arrests by Deputy Graves, and
hence whether there was, or whether Deputy Graves could reasonably
have concluded there was probable cause for plaintiff's arrest,
are obviously in dispute.  These disputed facts make summary
judgment inappropriate.  See Coons v. Lain, 277 Fed. Appx. 467,
471, 2008 WL 1983580, 3 (5th Cir. 2008) (affirming denial of
summary judgment on qualified immunity where deputy's motion was
based on his own account of the facts, which was directly disputed
by the plaintiff, and stating, "If we accept [the plaintiff's]
version of the facts, as we must when reviewing a grant of summary
judgment, [the deputy's] detention of [the plaintiff] was not
supported by articulable facts that criminal activity was afoot.
Under this version, [the deputy's] actions were objectively

unreasonable and he should not be shielded by qualified

immunity.").[3]

Having said that, in the court's opinion, Graves is entitled

to qualified immunity with respect to plaintiff's charge that he

violated plaintiff's Fourth Amendment right to be free from an

unlawful search merely by entering onto plaintiff's property.  It

has been held as a general proposition that "a search of one's

home or its curtilage, effected as a result of a trespass, is an

---

[3]     Plaintiff has argued that this court must conclude that
probable cause was lacking as a matter of law based on the finding
of the Madison County Justice Court following Gilmer's trial on
the subject charges that there was no probable cause for Gilmer's
arrests.  The only evidence plaintiff initially offered in support
of his claim that there was a ruling by the justice court on the
issue of probable cause is plaintiff's own affidavit and that of
another attorney who was present at the trial and who claims that
the judge's dismissal of the charges implied a finding that
probable cause was lacking.  This proof is hearsay which is not
properly before the court.  See Warfield v. Byron, 436 F.3d 551,
559 (5th Cir. 2006) (noting that hearsay evidence is inadmissible
for summary judgment purposes under Federal Rule of Civil
Procedure 56).  However, on November 7, 2008, after briefing on
both defendants' motions had ended, plaintiff filed a motion for
authority to supplement his response with an order signed and
entered by the justice court judge on October 28, 2008 purporting
to dismiss the charges brought against plaintiff by Graves on the
basis that there was no probable cause for the charges.  Plaintiff
urges the court to allow him to supplement his response with this
order, and to conclude that the justice court's putative finding
of no probable cause evidenced by this order be given preclusive
effect on the probable cause issue in this case.  The court will
deny plaintiff's request to supplement.  This court is certainly
not bound by the justice court's putative finding regarding
probable cause, particularly given the odd circumstances
surrounding its entry, most notably, the fact that the order was
entered nearly two years after the justice court judge had already
entered orders finding Gilmer "not guilty," and apparently entered
the orders at the instance and request of Gilmer.  The court would
also note that in any event, the question for this court at this
time is not whether there was probable cause, but whether Deputy
Graves could reasonably have thought there was probable cause.

15

encroachment on a person's expectancy of privacy and is for that reason, but not because of the trespass, a violation of the Fourth Amendment if not based on probable cause or authorized by a search warrant." United States v. Jackson, 585 F.2d 653, 660 (4th Cir. 1978).  However, "courts generally recognize a 'knock and talk' exception to the warrant requirement," which permits them "to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may." Estate of Smith v. Marasco, 318 F.3d 497, 519 (3rd Cir. 2003) (citing Rogers v. Pendleton, 249 F.3d 279, 289-90 (4th Cir. 2001)).  See also U.S. v. Taylor, 458 F.3d 1201, 1204 (11th cir. 2006) (quoting Estate of Smith v. Marasco).  "According to one scholar, 'when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go ( e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.'" Marasco, 318 F.3d at 519 (quoting Wayne R. LaFave, 1 Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f) (3d ed. & Supp. 2003) (footnotes omitted)).  Furthermore, a number of courts have recognized a "community caretaker" exception pursuant to which officers are permitted to make a warrantless entry onto an individual's property and even into his house due to excessively loud music that disturbs neighbors. See, e.g., United States v. Rohrig, 98 F.3d 1506, 1522 (6th Cir. 1996) ("In particular, a

compelling governmental interest supports warrantless entries
where, as here, strict adherence to the warrant requirement would
subject the community to a continuing and noxious disturbance
[loud music in this case] for an extended period of time without
serving any apparent purpose."); Bies v. State, 251 N.W.2d 461,
468 (Wis. 1977) (finding that the early morning investigation of a
noise complaint is "part of the 'community caretaker' function of
the police which, while perhaps lacking in some respects the
urgency of criminal investigation, is nevertheless an important
and essential part of the police role"). And while plaintiff has
argued that there are no cases in Mississippi that have recognized
these exceptions, neither are there any Mississippi cases or cases
from the Fifth Circuit which foreclose applicability of these
exceptions. Thus, at the very least, it was not clearly
established at the time of the incidents in question that an
officer needed a warrant to enter onto private property to speak
with the owner or occupant regarding his neighbors' complaint of
disturbing the peace. Cf. Antoine v. Rucker, No. 03-3738, 2006 WL
1966649, at *6 (D.N.J. July 12, 2006) (holding that police
officers who, while responding to a noise complaint, made a
warrantless entry into an individual's apartment shortly after the
loud music had been turned off were still entitled to qualified
immunity because "there was no 'clearly established' law at the
time of the entry specifically instructing the Officers to stop in
their tracks while responding to a noise call if, noticing the

Officers' approach, the occupants of the home abated the nuisance.").

Plaintiff does also allege that, after coming onto his property on April 15, Graves and other deputies undertook a rather extensive search of the premises.  However, Graves has testified that he did not take part in any such alleged search and plaintiff has offered no proof to the contrary.  Because there is no proof that Graves was involved in any search of Gilmer's property, then as to plaintiff's charge that Graves violated his right to be free from unlawful searches, Graves is entitled to qualified immunity, and this claim will be dismissed.

Plaintiff's claim against Graves for excessive force relating to having applied handcuffs too tightly will also be dismissed. "To prevail on an excessive force claim, a plaintiff must establish: '(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'"  Freeman v. Gore, 483 F.3d 404, 416 (5th Cir. 2007) (quoting Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005)).  The Fifth Circuit has repeatedly held that "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force."  Id. at 417.  See also Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001) (stating that "handcuffing too tightly, without more, does not amount to excessive force").

## Sheriff Trowbridge

Sheriff Trowbridge cannot be held vicariously liable under § 1983 for the acts of his subordinates because "Section 1983 does not create vicarious or respondeat superior liability." Evett, 330 F.3d at 689 (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). A supervisor can only be found individually liable under § 1983 on the basis of his own personal participation in the wrongful conduct, or where there is a causal connection between the supervisor's acts and the alleged constitutional violation. Hinshaw v. Doffer, 785 F.3d 1260, 1263 (5th Cir. 1986).

Plaintiff's position is that Sheriff Trowbridge personally participated in and supervised both Graves' illegal entry upon the Gilmer property and his subsequent unlawful arrest of plaintiff through his radio communications with Deputy Graves. In fact, the only evidence plaintiff has offered to demonstrate Sheriff Trowbridge's alleged personal involvement in Graves' entry onto plaintiff's property and plaintiff's subsequent arrest(s) are the April 14, 2006 radio communications between Graves and Trowbridge prior to Graves' encounter with plaintiff. When Graves was en route to the Millers' home, Trowbridge told Graves,

> I think Barry Gilmer is giving [Mrs. Miller] fits. We've [Mrs. Miller and I] discussed it before. ... See what you can do to help her there. You know, I don't know what he's doing over there, but even if it takes going over there and talking to him or whatever.

Later, after Graves reported that Matthew Gilmer had refused to provide information so that he could make out his report on Pam Miller's complaint for disturbing the peace and had informed the sheriff that the elder Gilmer was on his way over, Trowbridge told Graves he could expect plaintiff "to have an attitude with [him]" and to "watch him." When Graves responded, "Sounds like disturbing the peace, I mean disorderly conduct," Trowbridge replied, "Better get somebody else over there with you."

Plaintiff submits, first, that by instructing Graves to do what he could to help Mrs. Miller, "even if it takes going over there and talking to him" (i.e., to plaintiff), Trowbridge specifically directed Graves to violate plaintiff's constitutional rights, i.e., to go onto plaintiff's property without probable cause in violation of plaintiff's constitutional right to be free from unreasonable searches. He claims the second exchange "clearly shows a constitutional violation ... with Trowbridge directly involved in supervising Graves." He suggests that this exchange evidences a preconceived plan between Trowbridge and Graves to arrest plaintiff on unfounded criminal charges, in that Trowbridge, after hearing of Graves' preconceived charge of disorderly conduct, gave his "stamp of approval."[4]

---

[4] Although plaintiff has sought to impose liability against Sheriff Trowbridge for the second alleged illegal entry onto his property, the alleged illegal search during that second entry, and his second arrest by Deputy Graves, there is no evidence at all to show that Sheriff Trowbridge had any personal participation in the events of April 15, or even any knowledge of these events, until after the fact.

In the court's opinion, the radio communications cited by plaintiff cannot reasonably be interpreted as evidence that Sheriff Trowbridge ordered Deputy Graves to violate any of plaintiff's constitutional rights. There was no clearly established law making it unconstitutional for law enforcement officers to enter onto an individual's property to speak with him in the same manner as any other private citizen, and in the court's opinion, the sheriff's suggestion that his deputy speak with plaintiff concerning the Millers' complaint was objectively reasonable, as a matter of law.

The court further rejects as unfounded plaintiff's charge that Sheriff Trowbridge approved in advance Deputy Graves' alleged plan to arrest plaintiff on contrived charges. In the court's opinion, without more, Sheriff Trowbridge's comment to Graves to "get somebody else over there with you," after Graves' stated, "[s]ounds like disturbing the peace, I mean disorderly conduct," cannot reasonably be construed as either a suggestion or directive to arrest Gilmer, or prior approval of an unlawful arrest. Sheriff Trowbridge did nothing more than direct Deputy Graves to get another officer on the scene with him. He did not instruct Graves to arrest plaintiff, and certainly did not instruct him to, or suggest that he arrest Gilmer on unfounded charges.

Plaintiff contends alternatively that even if Sheriff Trowbridge cannot be held individually liable on the basis of his personal participation in Graves' entry onto his property and the

ensuing unlawful arrest, he is nevertheless subject to individual liability on the basis of his failure to adequately train and/or supervise his officers, including Deputy Graves.  In the absence of personal participation in the constitutional violation, to establish § 1983 liability against a supervisor, such as Sheriff Trowbridge, "the plaintiff must show that: (1) the [sheriff] failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights."  Roberts v. City of Shreveport, 397 F.3d 287, 291–292 (5th Cir. 2005) (citations omitted).  See also City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989) ("The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); Southard v. Texas Bd. of Criminal Justice, 114 F.3d 539, 550 (5th Cir. 1997)("[T]he misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor.").[5]

---

[5]Of course, it must first be determined whether a subordinate's actions violated the plaintiff's constitutional right, for a supervisor has no potential liability if his alleged failure to train or supervise did not cause a constitutional violation.  The court here has concluded there was no violation of plaintiff's right to be free from excessive force.  The only potential constitutional violations are an illegal entry onto

To establish the first prong of this test, a plaintiff usually must show that the supervisory official knew or should have known of a "history of widespread abuse" and the consequent need for training or supervision. See Bowen v. Watkins, 669 F.2d 979, 988 (5th Cir. 1982) (explaining that "[u]sually, a failure to supervise gives rise to section 1983 liability only in those situations in which there is a history of widespread abuse. Then knowledge may be imputed to the supervisory official, and he can be found to have caused the later violation by his failure to prevent it."). To demonstrate a causal connection between a failure to train or supervise and the alleged constitutional violation, the plaintiff must prove that the supervisor knew that the alleged abuses were so prevalent that he had a duty to prevent them. See Lozano v. Smith, 718 F.2d 756, 768 (5th Cir. 1983).

To satisfy the deliberate indifference prong, a plaintiff must show that the supervisory official was "both aware of facts from which the inference could be drawn that a substantial risk of serious harm [i.e., an actionable constitutional violation] exists, and he must also draw the inference." Smith v. Brenoettsy, 58 F.3d 908, 912 (5th Cir. 1998) (citing Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994). "[P]roof of deliberate indifference, generally requires a showing 'of more than a single instance of the lack of

_____

plaintiff's property (which is likely no violation at all, though this is not an issue that need be definitively resolved for the present motion) and the alleged unlawful arrests.

training or supervision causing a violation of constitutional rights.'" <u>Burge v. St. Tammany Parish</u>, 336 F.3d 363, 370 (5th Cir. 2003) (quoting <u>Thompson v. Upshur County, TX</u>, 245 F.3d 447, 459 (5th Cir. 2001)). "Rather, deliberate indifference generally requires that a plaintiff demonstrate 'at least a pattern of similar violations' arising from training (or supervision) that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" <u>Id.</u> (quoting <u>Thompson</u>).

In support of his charge that Sheriff Trowbridge failed to train his officers regarding the alleged requirement for a warrant in order to enter onto private property, plaintiff points to testimony by Deputy Graves that "[w]e talk to complainants all the time about loud music, so I went to speak with him (Gilmer)." Plaintiff asserts that "Deputy Graves admits that it is his and the Madison County Sheriff's Department's custom and policy to interrogate persons legally playing loud music if the deputy chooses." That Sheriff Trowbridge allowed his deputies to speak with persons against whom noise/disturbing the peace complaints have been made does not evidence deliberate indifference to anyone's constitutional rights.

Moreover, as for Graves' alleged unlawful arrest of plaintiff, plaintiff has not alleged or presented any evidence showing that Deputy Graves, or any other deputies, had a "history of widespread abuse," or, even if Deputy Graves did have such a history, that Sheriff Trowbridge knew or had reason to know of it.

In response to Sheriff Trowbridge's motion, plaintiff has argued that this court should view plaintiff's April 14 and April 15 arrests as two separate occasions of abuse by Deputy Graves; but even were the court to do this, that still would not demonstrate that widespread abuse existed within the Madison County Sheriff's Department. See Hinshaw, 785 F.2d at 1264 (where an officer had been investigated on three separate occasions concerning his use of force, that did not qualify as "widespread abuse" sufficient to put the supervisor on notice that the officer "had a tendency to use excessive force"). Moreover, as defendant correctly notes, plaintiff has in any event produced no evidence that Sheriff Trowbridge even knew about plaintiff's second arrest or the circumstances surrounding that arrest.

Plaintiff has also offered purported evidence of inmate abuse at the Madison County Detention Center, along with an affidavit from a William Barnett who claims that in April 2007, Deputy Graves arrested him without probable cause for an offense Barnett claims he did not commit. Evidence of alleged inmate abuse at the county jail does not tend to establish "a pattern of similar violations" to plaintiff's alleged unlawful arrests, nor is an alleged unlawful arrest by Deputy Graves a year *after* the events at issue here relevant to whether Sheriff Trowbridge was on notice that a failure to train or supervise Deputy Graves might result in violation of plaintiff's constitutional rights.

For these reasons, the court concludes that Sheriff
Trowbridge, in his individual capacity, is entitled to summary
judgment on plaintiff's § 1983 claims.

<u>Plaintiff's Conspiracy Claim</u>

In his complaint, plaintiff has alleged that Sheriff
Trowbridge conspired with Pam and Tommy Millers' "false
allegations to Deputy Graves with the specific intent of causing
the wrongful arrest of Plaintiff" and conspired with Deputy Graves
"to falsely charge [plaintiff] with disorderly conduct."
Plaintiff purports to assert this conspiracy claim under § 1983.

> "To establish a cause of action based on conspiracy a
> plaintiff must show that the defendants agreed to commit
> an illegal act."  General conclusory charges of
> conspiracy with "no specific allegation of facts tending
> to show a prior agreement" cannot survive a motion to
> dismiss.  The complaint must include specific factual
> allegations showing a prior agreement, plan or meeting
> of the minds between the defendants and a state actor.

<u>Hey v. Irving</u>, No. 97-60816, 1998 WL 723819, 2 (5th Cir. Oct. 2,
1998) (citations omitted).  <u>See also</u> <u>Bacque v. Scott</u>, Civil Action
No. 04-1427, 2007 WL 3169089, 2 (W.D. La. Oct. 22, 2007) ("The
elements of civil conspiracy are (1) an actual violation of a
right protected under § 1983 and (2) actions taken in concert by
the defendants with the specific intent to violate the
aforementioned right.").

In the case at bar, it is manifest that plaintiff has failed
to adduce evidence that could reasonably support a finding of an
alleged conspiracy.  Plaintiff's conspiracy claim against
defendants is based on his allegations that Sheriff Trowbridge

knew the Miller family and knew, from conversation with Mrs.
Miller, that she and her husband had been having problems with
Barry Gilmer and were involved in litigation of some sort with
Barry Gilmer.  Trowbridge, he claims, had already actively and
knowingly offered the Madison County Sheriff's Department's
assistance to the Millers in handling their problems, or
"troubles" with Gilmer, having told Mrs. Miller that she should
call the Sheriff's Department if she continued to have trouble
with Mr. Gilmer, because "that's what the Sheriff's Department is
there for."

Indeed, it is undisputed that Trowbridge knew the Millers,
having attended the same church as they attended some eight or ten
years prior to the incidents at issue.  His wife also taught piano
lessons to the Millers' daughter, and in fact, it was during one
of these piano lessons that Mrs. Miller saw the sheriff and
lamented the troubles she was having with her neighbor.  Clearly,
however, proof that the sheriff merely told Mrs. Miller that she
should call the Sheriff's Department if she had further problems
with her neighbor, Mr. Gilmer, does not tend to establish the
existence of an agreement, plan or meeting of the minds to violate
Mr. Gilmer's constitutional rights in any manner.  Neither does
the fact that Mrs. Miller ultimately did call the Sheriff's
Department (by her account, many months after her conversation
with the sheriff) to complain about activities occurring on
plaintiff's property and that a deputy was sent out in response to

27

her call and that this deputy ultimately arrested Mr. Gilmer, allegedly without probable cause, tend to establish the existence of an alleged conspiracy.[6]  Plaintiff insists that the fact that Sheriff Trowbridge told Deputy Graves "to see what he could do to help (Mrs. Miller) out," particularly when coupled with his prior pledge of assistance from his office, tends to confirm the existence of the alleged conspiracy.  In the court's opinion, however, this statement to Graves adds nothing of relevance, and does not tend to show there was ever any agreement of any sort to infringe plaintiff's constitutional rights.  Plaintiff's conspiracy claim will be dismissed.

Plaintiff's State Law Claims

The Mississippi Tort Claims Act (MCTA), Mississippi Code Annotated § 11-46-1, et seq., provides the exclusive remedy to plaintiff for his claims against defendants.  See Miss. Code Ann. § 11-46-7.  Both defendants submit that plaintiff's state law claims against them in their individual capacities are barred by the MTCA.  The Mississippi Tort Claims Act provides for a limited waiver of the sovereign immunity of the state and its political subdivisions for tort claims against a municipality and

---

[6]     Plaintiff maintains that Pam Miller was also the individual who called to complain about noise at the Gilmer property in the early morning hours of April 15.  The court acknowledges Gilmer's position, but finds it is not supported by the record evidence, and is irrelevant in any event.  There is nothing to suggest that Sheriff Trowbridge knew there had even been a further complaint about the Gilmers, and there is nothing to show that Deputy Graves knew the identity of the complainant.

its employees for actions taken within the course and scope of their employment.  The Act provides:

> [T]he immunity of the state and its political
> subdivisions from claims for money damages arising out
> of the torts of such governmental entities and the torts
> of their employees while acting within the course and
> scope of their employment is hereby waived....

Miss. Code Ann. § 11-46-5(1).  The Act further provides that recovery under the Act is the exclusive remedy for injuries for which the Act has provided a waiver of sovereign immunity, stating that "any claim made or suit filed against a governmental entity or its employee to recover damages for any injury for which immunity has been waived under this chapter shall be brought only under the provisions of this chapter...."  Miss. Code Ann. § 11-46-7(1).  The Act carves out certain exceptions to the waiver of immunity.  For example, no recovery may be had against a municipality or its employees for acts which are discretionary functions taken by employees in the scope of their employment. See Miss. Code Ann. § 11-46-9(1) ("A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim ... [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employees thereof, whether or not the discretion be abused.").  Also, immunity from liability remains in place for official acts of a municipality or its employees performing "duties or activities relating to police ... protection unless the

employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." Miss. Code Ann. § 11-46-9(c). "'[R]eckless disregard' embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." Turner v. City of Ruleville, 735 So. 2d 226, 230 (Miss. 1999). Finally, the Act provides that actions that constitute such things as malice and defamation occur outside the course and scope of employment, and the municipality has not waived immunity from suit with respect to such acts and cannot be held liable for them. See Miss. Code Ann. §§ 11-46-5(2), 11-46-7(2). See Wilkinson v. Mayor and Aldermen of City of Vicksburg, Civil Action No. 5:05-cv-94(DCB)(JMR), 2008 WL 130630, 1 (S.D. Miss. Jan. 10, 2008) (summarizing pertinent provisions of MTCA).

Here, Sheriff Trowbridge argues that he was at all times acting within the course and scope of his employment, and that his acts fall within either or both of the discretionary function and police protection provisions. The court agrees, and concludes he is entitled to summary judgment in his individual capacity as to plaintiff's state law claims. See Wilkinson, 2008 WL 130630, at 2 ("Inasmuch as ... Captain Culbertson's involvement was in a supervisory and directorial role, he is entitled to discretionary function immunity pursuant to § 11-46-9(1)(d), and is entitled to summary judgment.").

However, while Deputy Graves argues that he retains immunity since he did not act with malice, or in reckless disregard of plaintiff's rights, the court concludes that there are genuine issues of material fact which preclude his request for summary judgment. See Duke v. Cartlidge, Civil Action No. 5:04CV322DCBJMR, 2006 WL 2788541, 6 (S.D. Miss. Sept. 26, 2006) (holding that "[t]o establish a claim of false arrest or false imprisonment, a plaintiff must prove that the defendant caused him 'to be arrested falsely, unlawfully, maliciously, and without probable cause'") (citations omitted); Wilkinson, 2008 WL 130630, at 2 (allegations that arresting officer deliberately failed to inform judge of facts relevant to probable cause determination could constitute reckless disregard); Foster v. Noel, 715 So. 2d 174, 178-80 (Miss. 1998)(upholding verdict against police officer for his acts in procuring invalid arrest warrant insofar as his conduct constituted reckless disregard for the rights of the plaintiff).

Conclusion

Based on the foregoing, it is ordered that plaintiff's motion to dismiss defendant Western Surety Company is denied; defendant Scott Graves' motion for summary judgment on plaintiff's individual capacity claims against him is granted in part and denied in part, as set forth herein; defendant Toby Trowbridge's

motion to dismiss or, in the alternative, for summary judgment in his individual capacity, is granted.

     SO ORDERED this 10th day of March, 2009.


                          /s/ Tom S. Lee
                          UNITED STATES DISTRICT JUDGE